Poweragent never alleged that EDS breached any of these three agreements related to the Series B financing. Poweragent never alleged that EDS breached the services agreement. Never. Not in the initial complaint. Not in the amended complaint. EDS never even claimed that for Poweragent to prove its claims about the Series D financing in the summer of 1997, Poweragent would have to somehow prove a breach of one of the Series B agreements. They've never even made that claim. Did Poweragent submit this arbitrability issue to the arbitrator? Poweragent argued to the arbitrators that they had authority under their own rules to decide to rule on jurisdiction. Right. And the arbitrators decided that they did have authority. Correct. Why isn't that the end of the case? Sorry? Why isn't that just the end of the case? We now look at their decision and we decide that it meets the standard of review of the FAA and that's it. Well, it can't be under first options. Well, why not? Explain to me why. Okay. First options held that merely arguing the arbitrability issue to an arbitrator But you didn't merely argue it as a defendant as they did there. And there you had a situation where somebody else was bringing the arbitration and their defense was we shouldn't be here. Right. That's not what's going on here. You went in and you affirmatively argued to the arbitrator that the arbitrator should decide this and had jurisdiction to decide it. Yes. Not that you didn't. And in Poweragent, in first options, they were arguing the arbitrator didn't have authority. Here you are arguing that the arbitrator did have authority. There's a difference between arguing that they had authority to make a ruling and agreeing that the parties would submit the issue of arbitrability to the arbitrators. I'm sorry. I don't understand that. Okay. Let me approach it this way. Rule 7 of the AAA commercial rules required Poweragent to state that it objected to the arbitrator's jurisdiction. Rule 7C states, quote, a party must object to the jurisdiction of the arbitrator or to the arbitrability of the plaintiff. You could object to it and say you have no authority to decide this and we object to being here. And that's not what you said. You said you do have authority to decide it. We objected to the jurisdiction and under Rule 7. But you agreed that they had the authority to decide it. You, in fact, insisted that they had the authority to decide it. They had the authority to decide it. Right. So if they have the authority to decide it, then if arbitrability is for the arbitrator and they decided it, then that's the end. Are you saying that you acknowledged they had the authority to decide it, but you were asking them not to decide it? No. Rule 7A says they have authority. Rule 7A of the AAA commercial rules says, quote, the arbitrator shall have the power to decide it. Did you ask them not to decide the question of arbitrability? We didn't ask them not to decide it. I asked them to decide it. And he asked them not to and you asked them to decide it. Right. So – Well, consider the alternative. Consider the alternative. We had a situation here where the complaint had been stayed. EDS had not sought and had told Judge Legg that it would not seek an order compelling arbitration. Power Agent is in limbo. Nothing is going to happen anywhere under that state of play. Power Agent had no choice but to commence an arbitration. Well, you could have appealed the refusal to allow you to amend a complaint. I'm sorry? You could have appealed the refusal to allow you to amend a complaint. I'm just – I didn't hear the appeal. Could you not have appealed the refusal to allow you to amend the complaint? We tried the mandamus. But could you have appealed it? Not at that time, no. You tried mandamus, but that's an extraordinary remedy. Why couldn't you just appeal it? Because, as I understand it, the statute has since been changed to allow that appeal where the complaint is dismissed. But at the time, in 1998, that was not the situation. So we actually – you had no choice at that point. You usually stuck. What usually happens is the other side cross moves to compel arbitration. So someone is actually affirmatively saying, look, we want to arbitrate. That didn't happen here. So Power Agent had – and months went by. I mean, months went by. And you could have taken the position before the arbitrator that this decision is not for the arbitrator and you don't agree to have the arbitrator decide whether it's arbitrable or not. And then you could have – if they insisted on deciding it anyway, you could have then gone to court under first options. But you didn't do that. First options speaks of the parties agreeing to submit the issue of arbitrability to the arbitrator. I mean, that's exactly what first option says. If the parties agreed – now, that agreement has to be in writing somewhere. It has to be in the original arbitration agreement or in the written submission. Merely arguing arbitrability to the arbitrators does not waive the argument or does not – is not a waiver and does not lose the de novo standard of review. Do you know any case in which somebody went to an arbitrator, said that you should decide arbitration, we agree you have the right to do this, and then went to court and succeeded under first options? Is there any case like that? I don't know any case either way, whether they succeeded or failed. I mean, my – one of my partners who specializes in international arbitration is aware of certain unreported situations occurring overseas where parties went to an arbitral tribunal and said, look, you know, we have these claims. We don't think these other claims are subject to arbitration. And awards were issued. So it does happen. It does happen. But there's no case either way. And I want to emphasize just the simple words of first options. Say, quote, on page 946, insofar as the Kaplans were forcefully objecting to the arbitrators deciding their dispute with first options, which Power Agent was objecting here, one naturally would think that they did not want the arbitrators to have binding authority over them. 514 U.S. at 946. So, you know, in first options, the Kaplans filed a written memorandum objecting to the arbitrators' jurisdiction. Now, they didn't file that memorandum saying, look, you don't have authority to decide this, but we want you to know we don't think you have jurisdiction. That's not what happened. In first options, the party went in and said, look, I want you to issue a ruling that you don't have jurisdiction. The arbitrators said no, and we have the decision we have. So, well, it's important. I just want to make sure I understand your position about what happened. Yeah. You said that you acknowledge that the arbitrators had jurisdiction to decide arbitrability. Yes. Yes. Now, are you next telling me, telling us that you didn't request them to make, the arbitrators to make that decision? No. We asked them to issue a ruling. Okay. As I say, under the AAA commercial rules, we had to object to jurisdiction, and we said that in the notice of arbitration. The panel then said, well, if there's an objection to jurisdiction, we should decide that as a threshold matter. So they did. We were not in the position of saying, look, we object to jurisdiction, but you don't have any authority to actually decide you don't have jurisdiction. The AAA rules say they do. But this is actually a, this is part of the policy point that I'm getting to. We had, this is an issue that comes up under the AAA commercial rules. An enormous amount of arbitrations happen under these rules. If this Court is going to hold that any party who objects to jurisdiction in a AAA commercial rule arbitration is deemed to have agreed. But that isn't what happened here. That is what happened. You affirmatively asked them to make this decision. Is that not correct? That's what I'm trying to understand. Yes, we're following their rules. Their rules say they have authority to. See, here's the difference.  And such ruling shall be binding on the parties. Then you would be under the first options rule that that's it. Did not EDS take the position that they didn't have authority to make this decision? They had authority. I thought EDS's position was that they didn't have, that they shouldn't decide the question. I'm sorry, I'm sorry. EDS's position was they had no authority at all. That's right. And you could have taken that position, too, and then you could have gone back to court. But you didn't take that position. Well, because we read the rule. I mean, the fact that we follow the AAA rule, this is my, this is the policy point. If you follow the AAA rules and say to an arbitral panel, look, we don't think you have jurisdiction, we object to your jurisdiction, and let's say you're the defendant, let's say you're resisting arbitration. We've neglected you for a long time. Do you want to get to the merits? I hope I get to, as in, you know, in terms of the court's analysis. The second factual point is the arbitrator's findings that are quoted on pages 16 and 17 of EDS's brief. The first set of findings EDS quotes are from this initial ruling in March of 2001. That was before any discovery. It was without any evidence. And, in fact, those findings were in a preliminary award, which EDS did not seek to confirm. Those findings are, therefore, of no effect whatsoever as a technical matter. More than a year has passed. EDS did not move to confirm those initial findings. The second set of findings, which were in the final award, which are the only findings that have been issued by anyone after any evidence has come down, did not find that all of the parties' agreements were all interrelated in an ongoing series of interrelated transactions. The second set of findings appear on page 17 of EDS's brief, and those simply find that the Series D financing agreement was inextricably linked, using the passive voice and not explaining who inextricably linked them, was inextricably linked with a new or amended services agreement. And that's the phrase that's used over and over and over again, new or amended services agreement, not the initial services agreement. No one ever claimed and no one ever found that the dispute over the Series D financing agreement, considered as the amended complaint alleges it was a specific event in the summer of 1997, arose out of or in connection with the December 1996 services agreement. No one has ever pointed to any, and this is my third factual point, no one has ever pointed to any contradiction between the amended complaint and the complaint. This is the only case, and you ask if there's any precedent. Other than this case, there is no precedent in American jurisprudence for the proposition that dropping a RICO claim constitutes a factual contradiction entitling the court to strike or dismiss an amended pleading. The fact is — What? Just a side note. Sorry. Are you arguing that the district court was wrong in not allowing you to amend, or are you arguing that the arbitration conclusion was sufficiently wrong that we should disapprove it? I'm arguing the district court was wrong in not allowing the amendment. I am also arguing that even taking the factual findings of the arbitral panel is true. Okay? Even granting them the high level of deference that you get to factual findings from an arbitral panel, they still don't get you to where EDS needs to get to prove arbitrability. The arbitral panel found that the Series D financing was linked, passive voice, unclear by whom, but let's even assume by both parties, to a new or revised services agreement. There's nothing in writing. There's nothing in the summer of 1997 talking about arbitration. And there's nothing in the arbitrator's findings that link the dispute over the Series D financing. But you're arguing that the arbitrator's decision as to arbitrability was incorrect. Yes. As a — taking their factual findings as true, giving the factual findings the full amount of deference, as a matter of law, Judge Legg got it wrong, and even the arbitrator's didn't get EDS to where it needs to get to prove arbitrability based on those findings. And I just urge the Court to look closely at the Simula case, which is the closest Ninth Circuit precedent. This is the case that has that magic phrase, touch upon, which EDS quotes a lot. They never talk about what Simula actually did. They never talk about what Ford v. N.Y.L. Kerr, the Fifth Circuit case, actually did. Simula over and over again talked about whether a claim would require the Court to interpret an agreement that had an arbitration clause, to interpret the party's obligations under the contracts that had an arbitration clause. Simula, there were three contracts, same as here, except in Simula all three had an arbitration provision, all three. There were claims in Simula that the defendant had breached agreements that predated the contracts that had arbitration clauses. The Ninth Circuit said, yes, those predated, and they were subsumed in and integrated into the later agreements that had arbitration clauses. There is, there is, Your Honors, no case that I'm aware of and no case that EDS has cited that says if you have a contract here that does not say the party's going to enter into later agreements, doesn't say this is a master agreement that is in anticipation the party's doing X, Y, and Z in the future, just have a contract, a services agreement, and a later dispute about financing, that the arbitration clause in this agreement doesn't refer to any other agreements as an integration clause, somehow governs a later dispute about financing. It just isn't there. You do have many cases in which parties enter one agreement and say we're going to enter into others. We're going to do other things. Simultaneous with this agreement about services, we are entering into these other agreements about financing and licensing and intellectual property, et cetera, et cetera. There are cases in which that happens, and the Court says, okay, well, because this was all part of one deal, the arbitration clause will apply. Is that the basic contention here, this was all part of one deal? Sorry? This is the basic contention here. That is absolutely EDS's contention. The arbitrators did not find that in their March 22 order. I thought they did find that. No, they did not. That's you've read EDS's excerpts from the initial findings in 2001 before there was any evidence. And EDS puts them one after the other in their brief.  And EDS did not move to confirm those findings. And then the second page, page 17, the finding is simply that the dispute over the services agreement was inextricably linked to a new or amended services agreement. Well, but that is a difference, Your Honor. I mean, a new agreement is a new agreement. Moreover, there is no claim that the dispute over the Series D financing agreement turns on anything to do with the new or amended services agreement. If you had a situation where the new or amended services agreement was in the cause of the dispute and the basis of Power Agent's claims, you might, again, have a factual argument that, well, this relates back to the earlier services agreement. That's not the case here. Power Agent's claim is that EDS made an agreement to invest and reneged on that agreement, not because it was tied to anything, not because it wasn't tied to anything. They had a deal. They reneged on the deal. It was a deal to lead a financing round. So I've already gone over. Would you like to take some time for rebuttal? Yes. I want to ask one question here. It's not crystal clear to me whether you're saying that in spite of the arbitration rules, they had no power to decide this, or are you saying they decided it, but they got it wrong? The latter. You are saying they did have the power to decide it. They had authority to decide it. Well, in that case, then we just need to review it under the definitional FIA standard. That was your argument? But, no, that's what first options to say. I mean, right at the beginning of first options, right at the very beginning, What is the difference between committing arbitrability to the arbitrator and deciding whether the arbitrator has authority to decide it? Aren't those both the same thing? No. That's exactly what Justice Scalia said is not the same thing. I'm sorry. I keep saying Scalia. I apologize. I'm thinking of another case. It's Justice Breyer. Justice Breyer. I have to apologize to someone, I think. But on page 942, Justice Breyer says there are three distinct questions. The merits of the dispute, arbitrability, and who should have the primary power to decide arbitrability. But if the arbitrator has the authority to decide arbitrability, then he has the primary authority to decide arbitrability. What's the difference between authority to decide arbitrability and commitment of arbitrability to the arbitrator? It's the same. No, it isn't the same because, in one, you've tied the arbitrator's hands. If both parties came in and said, look, you don't have jurisdiction, but you have no choice. You've got to hear this anyway. That's ridiculous. That's inefficient. That's a waste of resources. First option is to have to have. Well, why did you come in and say you are? I just let me put it this way. There is no clear and unmistakable evidence of an agreement by the parties to submit arbitrability to the arbitrators. It's not in the services agreement. If that's true, then they had no authority to decide it. Then we were wrong. Then we were simply wrong. The fact that we made an argument to the arbitrators, which we lost on. Well, you didn't lose on the question of whether they had the authority. Oh, we did. No, we did. They said they didn't have authority. They said even if they had authority, they were bound by the district court. First opinion, second opinion, they were bound by the mandamus opinion. And, by the way, on the merits, even though there's been no discovery and no evidence whatsoever, we hereby find that everything was all interrelated. They threw every possible argument at us, but they began by saying, as an initial matter, we don't have any authority to decide this. Thank you. Well, wait. I don't know that the answer to my question is clear. Are you saying now that no matter what you said in arbitration, no matter what their rules are, that panel lacked the power to decide whether or not this issue is subject to arbitration, and no matter what they said, we should ignore it? Are you saying that? No. Are you saying that they did in fact decide that they had that power then to decide the question of arbitrability, and they simply decided it wrong? Yes. Just as Judge Legg had the authority. And it's a question of standard of review. Well, I know. So then on the issue of whether or not this dispute is subject to arbitration, we have a decision made in arbitration by an authority that had the power to decide it, and we should accept that, as the district court did, unless in giving it all of the deference we have to, we can say it's wrong. Is that where we are? No. You have to decide it's a no vote. I mean, first options said courts should not assume that the parties agreed to arbitrate arbitrability. I'm not talking about agreeing. I'm talking about the power of that forum to decide an issue that you say it had the power to decide. Yes. But decided wrongly. Right. So the issue is decided by that group, and we are simply to decide whether or not, given the standards of deference that the courts are required to, it decided it wrong or right. Well, except there is no deference to the scope of a contract. It's a legal matter. I'm sorry if that's been the confusion. Well, it is confusing if we say that this forum has the power to decide it, but now that it's decided it, we can ignore it as if it had no power, because we can look at a contract and say it had no power to do it. The arbitrator's decision deserves no greater or less deference than Judge Legge's decision. That's all I'm saying. Okay. That's what I'm saying. Thank you, counsel. Good morning. May it please the Court, my name is. So who had the authority? Both. Yeah. To their authority. Well, it wasn't quite that way. As the Court knows, the issue of arbitrability was first submitted to Judge Legge in the district court, and he found that the complaint, as pleaded, was arbitrable, and he stayed the case. And he didn't allow them to amend the second complaint. Because he said that they were contradicting themselves, which seems quite questionable. Okay. So then they went to the arbitration starts, and they submit, as I understand it, to the arbitrator, both the original complaint, essentially the dispute as framed in the amended complaint. Is that right? The first demand for arbitration attached both the complaint and the amended complaint. Eight months later, an amended demand for arbitration was submitted by a power agent that only attached the amended complaint. All right. So what's going to the arbitrator was really broader than what was before the district court. I believe that's correct, Your Honor. Then power agent submitted to the arbitrator a request that the arbitration panel determine arbitrability. In the supplemental excerpts of record, page 256, is the beginning of their argument, and it is entitled, the tribunal, meaning the arbitration tribunal, has the authority and the obligation to determine its own jurisdiction. On the next page of the power agent's submission to the arbitration panel, supplemental excerpt of record 257, power agent said to the arbitrators, quote, in short, the parties agreed to give the tribunal the power to rule on its own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement. They continue to say, quote, the district court was obligated to honor the party's clearly expressed intent. The stay order was just that, an order staying the litigation, pending a decision from the tribunal about arbitrability. That's on page 257. In response, what EDS said was that the decision had already been made by the district court. Judge Lake had already decided that this was arbitrable. There was no need to reconsider that decision. That being said, the arbitration panel went ahead in response to power agent's request, heard oral argument, looked at the evidence submitted in response to the plea. Can one party confer authority on the arbitration panel to decide the question of arbitrability? Well, Your Honor, normally the question of arbitrability should be determined by the contract itself. And the general rule is that if the contract does not say anything specific about who has jurisdiction to decide, then either can decide. And normally this will come up first. That's true. I thought the general rule is that arbitrability has to be committed to the arbitrator or it's not committed to the arbitrator. Well, normally it will come up, Your Honor, in the context of a district court proceeding, and the case law says that if the arbitration provision is not clear, then the district court itself has the authority to decide arbitrability. That's why in the first instance EDS submitted this question of arbitrability to Judge Lake in the district court. Then, as you know, it went forward and the arbitrators decided as well. And their decision was that ---- Your Honor, I mean, if you say that if your position was before the arbitrator that the arbitrator didn't have the authority, then it would seem that there's not really a contract saying it necessarily, but that there's a waiver problem. Essentially ---- Yes, Your Honor. As we presented to you at this point now on the appellate level, the question is truly whether Power Agent has waived the right to claim that the arbitrators did not have the authority to make this decision because it was Power Agent, after all, that submitted the question over EDS's objection to the arbitrator. What is your version of the story about the two different arbitrator decisions? About the two different ---- The fact that there were two arbitrator decisions in there, an earlier one which hasn't been confirmed and a later one. Well, the fundamental question as to arbitrability here turns on an issue of fact, as Your Honor previously noted, which is are these contracts an interrelated part of one transaction? The law is clear that if they are under international ambassador or under Neal v. Hardy's Foods, if they are part and parcel of one ongoing transaction, then any dispute in connection with those transactions is arbitrable. So at the end of the day, the truth is what is decided after considering all of the evidence after the month-long trial and what was it that the arbitrators unanimously decided. That has been submitted to the court, and I would submit under first options, this panel is required to accept those findings of fact unless they are clearly erroneous. Here they are certainly not. In the ultimate decision of the arbitrators, in paragraph 7, which is supplemental excerpt of record 444, the arbitrators talk about the services agreement and the initial investment by EDS. The unanimous decision was this, quote, The primary interest of EDS was a long-term services agreement to provide the technical services and support originally sought by Power Agent. Power Agent was using the prospect of such a services agreement to induce EDS to make an equity investment. EDS would not have made an equity investment but for the simultaneous execution of the services agreement and the requirement that a substantial portion of the equity investment be immediately returned to EDS as a prepayment on the services agreement. So that finding of fact is not challenged here by appellant. So it must be accepted as true, and it is clearly supported by the record, that the initial investment and the services agreement were inextricably intertwined, part and parcel of the same transaction. The supposed last agreement that was the subject of the amended complaint. Thank you, Your Honor. The arbitrators also addressed that later on, two pages later in their decision, which is the supplemental excerpt of record page 446. There, in paragraphs 16 and 17 of their decision, the arbitrators said, again, that the primary interest of EDS in July, August, and September of 1997, that's now the next summer, was still the long-term services agreement, and Power Agent was continuing to use that agreement and the prospect of a new or amended services agreement, expanding the scope. But that does seem disturbing because if there was a new and expanded agreement, it might or might not have an arbitration provision. So how can it be that the fact that this supposed new commitment for the alleged new commitment for financing turns on the old service agreement as opposed to one that doesn't yet exist? Well, Your Honor, this was a broad arbitration clause in the services agreement. It was any dispute arising under or in relation to or in connection with the services agreement. This Court has consistently interpreted that as a broad clause, and the services agreement itself was repeatedly a part of the evidence at the arbitration because revisions to it, changes to its terms in terms of the pricing, in terms of the length, in terms of the amount of work that EDS was going to provide to EDS, that was bound up in the entire transaction as to whether there would be another investment by EDS. Basically, what you've heard here is Power Agent's view of the world, which was that there was no quid pro quo for the alleged new investment. But, of course, the arbitrators heard both sides, and from the perspective of EDS, the only reason to consider any further investment was further work under the services agreement, revisions to the services agreement. So the dispute clearly touched upon, it was bound up with, indeed, the services agreement. That's why the arbitrators found in paragraph 17 of their final ruling, quote, just as the EDS investment in the Series B round was tied to the services agreement, any possible further equity agreement was inextricably linked to a new or amended services agreement. Now, Your Honors, under the first options decision, that finding of fact must be accepted by this Court. Why, if it's inextricably linked to a new or amended service agreement, it's linked to the old service agreement? It's related to rising under in connection with the old service agreement. Well, Your Honor, there are about ten pages of evidence in our brief as to how these documents were intertwined with one another. And as you will see, what the evidence showed to the arbitrators was that there was an ongoing discussion between EDS and Power Agent as to whether or not the payment terms would be changed, whether it would be changed from cost plus pricing to transactions-based pricing, whether EDS would do additional work and therefore be paid more money. But there was never any question about changing the arbitration provision. That was not a discussion at all between the parties. What was intertwined was EDS, will you please invest more money? And EDS saying, perhaps, but only if we get more work under the services agreement. That's why it's all part and parcel of the same transaction, exactly the same as, for example, in the Neal v. Hardy's food case where there was a franchise agreement to get Hardy's hamburger stands and one of the contracts related to buying the property. And the other contract related to licensing the trademark and the Hardy's name. Well, one contract would not have existed without the other. And consequently, the Fifth Circuit in the Neal v. Hardy's food case held that they were part and parcel of one transaction. Consequently, the arbitration provision applies. Precisely the same thing existed here. They were part and parcel of the same transaction, and consequently the arbitration agreement applies. Let's go back to the authority question for just a moment. What's your best case that says it in this context? This is a waiver. I believe that it would be the first options case because in first options there the plaintiff said that we specifically did not agree that the arbitrators had authority to decide this. But we went along, we objected to their authority. We said this was not arbitrable. Now, therefore, the district court should review this on a de novo basis. Here the opposite occurred, of course, and it was that Exactly, because the power agent did on the merits say it wasn't arbitrable. You're right, Your Honor, that's correct. Here they submitted the question to the arbitration panel. They asserted that it was not arbitrable. The arbitration panel held we think that we are bound by the district court and by the Ninth Circuit's mandamus decision, but even if we were not, we also think this is arbitrable. And then, of course, the arbitrator The Ninth Circuit's mandamus decision really isn't relevant to any of this, right? To the extent, if any, that the court is concerned that Judge Legge was incorrect in not granting and not accepting Whether it was or wasn't is really not relevant to the arbitration decision because they submitted the amended complaint to the arbitration panel. The arbitration panel decided it. So the mandamus is totally irrelevant to the validity or invalidity of the arbitration panel. That's correct, Your Honor. That's correct. I think that, if I had to speculate what the arbitration panel was thinking, was that if the Ninth Circuit had thought this did not belong in arbitration in the first instance, it could have stopped it at the mandamus in January of 2000. Be that as it may, Your Honor is exactly correct that with regard to the amended complaint, that was not before either Judge Legge or the Ninth Circuit. It was presented, the arbitrability was presented to the arbitration panel by Power Agent and the arbitration panel did make a decision. What was CDF's position about the arbitrability of that since that couldn't have been decided by Judge Legge? Let me be more specific. What was your position as to whether that issue was properly before the arbitrator, the arbitrability of that? We argued, Your Honor, that the decision as to whether this amended complaint or the allegations in it were subject to arbitration needed to be resolved at the arbitration proceeding itself because it was such a factually intense question. So, in other words, while you objected to the arbitrator deciding the arbitrability of the first complaint, of the original complaint, you did not object to the arbitrator deciding the arbitrability of the amended complaint? We said that we did not think it was right for a decision at that time because the discovery had not yet happened. They hadn't heard all the evidence which we intended to put in showing that these contracts were inextricably intertwined. But you eventually did. We eventually did put that evidence in and, as it turns out, they ruled in our favor twice. So as to this question of whether the parties agreed to submit the arbitrability to the arbitrator, you're now saying that you did, aside from an e-waiver issue, with regard to the amended complaint because you both took the position before the arbitrator that the arbitrability of the amended complaint was properly before the arbitrator? Yes, that's right, because it had never been considered by the district court. In other words, you both brought the issue to the table for the arbitrators to decide. It was there on the table for them to decide. The question was whether it would be done on motion or after a hearing of evidence. The arbitrators decided they could do it based on the evidence in front of them at that time. And as you see from their final decision, after the month-long trial and all the 21 witnesses, et cetera, the evidence proved out exactly as EDS had suggested, which was that these are part and parcel of the same transaction. So maybe by at least by your conduct you agreed to have this issue determined by the arbitrator. I think that, with regard to the amended complaint, I believe that's correct, Your Honor. Okay.  Thank you for your time. Thank you. Just a couple of rebuttal points. I'll let you have a minute. Thank you. You're over your time. I know, I know. With all respect, Mr. Gilliland is simply mistaken. EDS objected to the arbitrators deciding anything about arbitrability. EDS's argument was that both the issue of the amended complaint and the complaint had been decided. Nonetheless, they participated in the arbitration. They participated. Okay. But the thing I want to just emphasize, I'm sorry if I didn't make it clear. I feel that I'm flashing back to the beginning of my clerkship when my judge explained to me standard of review, standard of review, standard of review. That's what we're talking about here. First Options is about the standard of review. It is not about waiver. It doesn't say there can be a waiver. You can't have an agreement by conduct to submit something to arbitration. There has to be a clear and unmistakable agreement to submit arbitrability to the decision of the arbitrators. Absent that, it is de novo review. That's all. It's de novo review, just as it was of Judge Lake. The concluding section of the First Options argument, opinion, discusses the policy reasons behind this. It says there's no policy reason in favor of having the arbitrators' decision on arbitrability be subject to deference. Justice Breyer, again with apologies to someone, Justice Breyer was very clear. He said there's no policy basis for that. We shouldn't presume that the parties intended to have the arbitrators decide their own scope. And I want to underscore that if the court ---- This is what's disturbing here. Yes. This isn't a presumption. This is something that you affirmatively represented to the arbitrator. I don't know whether this is by nature of judicial estoppel or exactly what it is, but you went and made an affirmative and definite and repeated, as I understand it, representation at that point, and now you're making a different one. That's very disturbing. No. We are trying to follow the AAA rules. That's all we were trying to do. I mean, if you read those AAA rules, they say the panel can rule on its own jurisdiction, has the authority. It does not say that by ---- it does not say that it's final. It does not say that by adopting the AAA rules, the parties have agreed to submit arbitrability to the arbitrators. Those AAA rules were amended after first options. I'm having a very hard time with that distinction. I don't understand how a panel that has the authority to decide something doesn't have the authority to decide. It's hard. They have the authority to decide it, but the authority is not subject ---- the decision is not subject to the highly deferential standard of review that an arbitral decision otherwise would be. That's the only distinction, but that is the absolutely vital distinction. That is the distinction between the second and third questions that were identified at the heart of first options. And Mr. Gilland, one other thing is related to this. Mr. Gilland said normally the question of arbitrability is determined by the contract. Normally? We've had a string of cases, Volt, Mastro Bono, Dean versus Bird, all of which in the last 10, 12 years, all of which the Supreme Court has tried to curb the reflexive ability to just send cases to arbitration, even where the parties don't agree. And if you come back to questions of ---- to principles of contract law and look at it that way and follow the literal words of first options, standard of review says de novo. Thank you. Thank you. The matter will stand submitted. Okay. We'll keep going. Keep going the next one. The next case on this morning's calendar is Bushley versus Credit Suisse first of all. Okay. This is Mr. Early. Good morning. Good morning. Michael Early for appellant Credit Suisse first Boston. This case presents some interesting issues on the merits of contract formation and agreement to arbitrate. Before I even get to that issue, I would like to discuss very briefly the jurisdictional issue. I was just going to raise that with you, so let's talk about that for a minute. Jurisdiction is claimed in this action under 9 U.S.C. section 16A1B.
judges: Leavy, Paez, Berzon